UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 07-10390-RGS

UNITED STATES OF AMERICA

v.

JOHN T. FOLEY and
PATRICIA MESHNA FOLEY

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS TO SUPPRESS STATEMENTS AND EVIDENCE

February 3, 2009

STEARNS, D.J.

After an evidentiary hearing, the court makes the following findings based on the credible evidence and testimony, supplemented by facts set out in the pleadings that are not in dispute.

1.  John T. Foley was a thirty-year veteran of the Massachusetts State Police. Foley held the rank of trooper.

2.  John Foley and defendant Patricia Meshna Foley had been married for three years at the time of John Foley's arrest. The couple maintained a home at 25 Highland Avenue in Saugus, Massachusetts. Robert Meshna, Patricia Foley's adult son by a prior marriage, and Jason Foley, John Foley's adult son by a prior marriage, also resided at the Highland Avenue home. John Foley and Patricia Foley used cocaine and other drugs.

3.  On November 27, 2007, John Foley and Patricia Foley were indicted by a federal

grand jury for possessing cocaine with the intent to distribute.[1]

4. On the afternoon of November 27, 2007, DEA Special Agent Todd Prough and FBI Special Agent Margaret Mackey drove to the Revere State Police barracks with a warrant for John Foley's arrest. Foley arrived to begin his shift at 3:45 p.m. He was ordered to the station commander's office. There he was confronted by the agents and a State Police lieutenant. Foley was relieved of his firearm and told of the indictment. He was then placed under arrest.

5. The agents escorted Foley to a 10' x 14' office with a window facing Revere Beach. Foley was seated, given a glass of water, and advised of the Miranda warnings. Foley was told that any cooperation on his part would be mentioned favorably to the prosecutor and the sentencing judge. After Foley executed a written waiver of his Miranda rights, he was asked if there were any drugs in his home. Foley replied that if there were, they belonged to his wife. Foley admitted that he had delivered drugs at his wife's request to customers while in uniform.[2] Foley signed a written consent for a search of his home. There was no discussion of Foley's employment status or the impact of the arrest on his pension rights.

6. After arranging for Foley to be booked, Prough and Mackey proceeded to 25 Highland Avenue. There they were met by two other FBI agents. (A State Police lieutenant and a lieutenant from the Lynn Police later joined the agents at the home).

---

[1]On April 1, 2008, a superseding indictment charged the Foleys with the additional crime of conspiracy to distribute cocaine and oxycodone.

[2]Among the Foleys' drug customers was an informant cooperating with law enforcement.

Jason Foley answered the door and summoned his stepmother from upstairs. Patricia Foley invited Prough and Mackey into the home. She directed the agents to the dining room. Patricia Foley sat at the dining room table with the agents and agreed to be interviewed.[3] She was told that her husband had been arrested. She began to cry and said that it was "all her fault." The agents told her that she was not under arrest and that she was not required to answer their questions. She was not advised of the <u>Miranda</u> rights. Foley was told that if she agreed to cooperate evidence of her cooperation would be brought to the attention of the prosecutor and the sentencing judge. Upon learning that her husband had consented to a search of the home, Patricia Foley also signed a consent search form. She was not advised of her right to refuse consent.

7. The agents were at the Foley residence from approximately 5:00 p.m. to 7:00 p.m. A search of the home turned up small quantities of cocaine and drug paraphernalia. Patricia Foley made incriminating statements. She also offered to telephone "William," her purported drug supplier, in an effort to cooperate.[4] She was allowed to answer her

---

[3]Two officers remained at the door of the dining room. The other two officers waited outside the house.

[4]Patricia Foley stated in a sworn affidavit in support of her motion to suppress that she never consented to a search of her home and that the agents had begun the search uninvited immediately upon arriving at the house. She also stated that she was told that if she cooperated no charges would be brought against her. She did not repeat these assertions in her testimony at the suppression hearing. She rather testified that she had never offered to cooperate, and that she had called "William" only because she was commanded by the agents to do so. On this and other material points, I find Patricia Foley lacking in credibility. Her testimony, by and large, was tailored and self-serving. Among other inconsistencies, she admitted that contrary to the assertion in her affidavit, she had in fact signed the consent search form (although she claimed not to have read it). Her memorandum of law and testimony also contradicted the statement in her affidavit that agents had not allowed her to leave the kitchen and dining room area of the home. In her

telephone, to meet with a business friend who visited the house during the interview, and to make arrangements with Robert Meshna to pick up John Foley after she learned that he had been released on bail.[5]  At no time did the agents raise their voices or make threats.[6] Some of the conversation with the agents was unrelated to the investigation. Among other incidentals, Patricia Foley spoke about her soy candle making business and offered to show some samples to the agents.

## RULINGS OF LAW

A. <u>John Foley: Motion to Suppress Statements</u>

John Foley bases the motion to suppress his statements on <u>Garrity v. New Jersey</u>, 385 U.S. 493, 497-98 (1967), a seminal case extending Fifth Amendment protections to public employees confronted with the Hobson's choice of incriminating themselves or

---

motion to suppress memorandum, she conceded that agents permitted her to go to the front door to meet with a friend delivering business-related papers. At the hearing, she revised her version of events further and testified that she was confined to the kitchen and dining room during a "majority" of the time.

[5]At approximately 6:00 p.m., Robert Meshna, arrived home to find his mother engaged in conversation with the agents. He observed her to be upset and agitated. He testified that he overheard the agents telling his mother that if she cooperated she would not be arrested. I find this improbable as the agents had been speaking with Patricia Foley for an hour before Meshna arrived. (In any event, Patricia Foley was not placed under arrest before or after the interview). Moreover, telephone company records confirm that Patricia Foley's calls to "William" (the drug supplier) were made at approximately 5:30 p.m., thirty minutes before Meshna testified to having arrived home. Meshna was permitted by the agents to speak with his mother and to proceed unescorted to his upstairs bedroom.

[6]Patricia Foley in her testimony did not claim otherwise – she stated only that Prough spoke "very firmly."

4

forfeiting their jobs.[7]  The Garrity protections are interpreted broadly to cover almost any significant penalty for failing to respond to an employer's questions.  See Sher v. United States Dep't of Veterans Affairs, 488 F.3d 489, 502 n.11 (1st Cir. 2007) ("Although Garrity itself dealt with a situation in which employees were threatened with removal, any situation in which the employee is subject to an adverse employment action is sufficient to trigger Garrity immunity.").

Foley does not allege that he was threatened with the loss of his job or his pension; he alleges only that he believed that if he refused to answer questions he would lose both. In his affidavit, he states:[8]

> [o]n November 30, 2007, I had just begun my scheduled shift when I got a radio call telling me to come to the state police barracks in Revere. As soon as I arrived, the desk sergeant told me that Lieutenant J.D. Mills, my supervisor, wanted to see me. As I approached his office, someone came behind me, took my gun, and forced me into the lieutenant's office.
>
> There were several law-enforcement agents in the office, including a state police lieutenant. One of the agents told me to sit down, and I did what he said. They then handed me an advice-of-rights form and had me sign it.
>
> The agents started interrogating me. I was very nervous and don't have a perfect memory of everything that was said. But my best memory is that they told me that I needed to tell them the truth about my involvement and my wife's involvement with drugs and that if I didn't, it could affect my job and my

---

[7]A public employer has the right to ask and expect answers to questions "specifically, directly, and narrowly relating to the performance of [the employee's] official duties . . . ."  Gardner v. Broderick, 392 U.S. 273, 278 (1968).  See also Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation, 392 U.S. 280, 284 (1968).  The employer may use the threat of discharge to compel answers to such questions, but only "so long as the answers elicited (and their fruits) are immunized from use in any criminal case against the speaker."  Chavez v. Martinez, 538 U.S. 760, 768 (2003) (plurality opinion).

[8]Foley did not testify at the hearing.

5

family. I remember thinking that if I didn't talk to them and answer their questions, I would lose my job.

Foley cites an Eleventh Circuit case, United States v. Waldon, 363 F.3d 1103 (11th Cir. 2004), for the proposition that a subjective fear of an adverse employment action is sufficient in and of itself to trigger Garrity. This, however, is a mistaken interpretation of Waldon's holding. Waldon states that a subjective belief will satisfy Garrity if, and only if, the belief is one that is objectively reasonable. More to the point, "[a] subjective belief is not objectively reasonable unless it derived from actions of the governmental unit." Id. at 1112, citing United States v. Vangates, 287 F.3d 1315, 1323 (11th Cir. 2002).

In Foley's case, even assuming the truth of his affidavit,[9] there is no basis for a finding of objective reasonableness. The threat to Foley's job came not from any failure to cooperate in answering questions, but from his having been caught using his cruiser to deliver illegal drugs. United States v. Indorato, 628 F.2d 711 (1st Cir. 1980), cited by the government, is a case directly on point. In Indorato, a State Police trooper was accused of larceny. He sought to suppress his incriminating statements, arguing that while he had not been overtly threatened with dismissal, he had felt that "such [a] threat was implied because the state police departmental rules, with which he was thoroughly familiar, provided for the dismissal of any officer who refused to obey the lawful order of superiors."[10] Indorato, 628 F.2d at 715.

---

[9] Foley, it will be recalled, was not a babe in the woods when it came to matters involving the Fifth Amendment. He was a State Police veteran of thirty years.

[10] In fact, as the First Circuit noted, there was (and is today) no State Police rule or regulation mandating dismissal from the force for refusing to answer questions.

The First Circuit disagreed, noting that "[i]n all the cases flowing from Garrity, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment . . . and (2) there is a statute or municipal ordinance mandating such procedure." Indorato, 628 F.2d at 716. See also United States v. Stein, 233 F.3d 6, 16-17 (1st Cir. 2000) (reaffirming Indorato).

As the Court continued in Indorato:

> [i]n this case, there was no explicit "or else" choice and no statutorily mandated firing is involved. We do not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within Garrity's cloak of protection.
> . . .
> Here, defendant did not claim the privilege. He was not told that he would be dismissed if he failed to answer the questions asked. He was not asked to sign a waiver of immunity. There was no statute mandating dismissal for refusal to answer hanging over his head. Defendant, here, was not, as in Garrity, put "between the rock and the whirlpool," 385 U.S. at 498; he was standing safely on the bank of the stream.[11]

So too with Foley. His case is indistinguishable from Indorato, and consequently, his motion to suppress fails.

B. Patricia Foley: Motion to Suppress Statements and Evidence

Patricia Foley bases her motion to suppress on two grounds. She first contends that she was interrogated without being informed of her rights under Miranda. Second, she

---

[11]While Foley's motion to suppress alludes to evidence seized in his home as a consequence of his statements, the validity of his consent to the search of his home appears not to be disputed. (It might also be noted that he disclaimed any interest in the drugs found in the house, attributing their ownership to his wife). In any event, because the court finds no constitutional infirmity in the circumstances under which Foley gave his confession, there is no fruit for the tree to poison.

7

maintains that she was "tricked" into confessing by a false promise that she would not be prosecuted if she cooperated.

1. Miranda warnings

Miranda warnings are required only when interrogation is "custodial."[12] Miranda v. Arizona, 384 U.S. 436, 444 (1966). "[T]he custodial setting is thought to contain 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" Minnesota v. Murphy, 465 U.S. 420, 430 (1984), quoting Miranda, 384 U.S. at 467. A defendant bears the burden of proving that she was in custody when an incriminating statement was made. United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984). The test of custody involves a variety of factors: (1) the place of the interrogation; (2) the nature of the interrogation, including whether the questioning was aggressive or informal, and the extent to which it was influenced in its contours by the suspect; (3) the duration of the detention; (4) the number of officers involved; and (5) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave (often evidenced by whether or not the interview terminated with the defendant's arrest).[13] See United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987);

---

[12] I note that Patricia Foley's Memorandum of Law misstates this critical element. Her opening argument reads: "Where the police believe that a suspect has committed a crime, they may not ask questions calculated to elicit an incriminating response in the absence of Miranda warnings, particularly where the facts before them constitute probable cause to make an arrest." Patricia Foley Memorandum, at 8. This is not a correct statement of the law.

[13] Foley's statement in her Memorandum, at 15, that the agents violated her Miranda rights because they had "clearly focused on [her] as a suspect" is (again) an incorrect

United States v. Chamberlin, 644 F.2d 1262, 1266-67 (9th Cir. 1980); United States v. Streifel, 781 F.2d 953, 961 n.13 (1st Cir. 1986); Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam).

The test of custody is an objective one. "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry': '[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" Thompson v. Keohane, 516 U.S. 99, 112 (1995), quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam). See also Yarborough v. Alvarado, 541 U.S. 652, 666-67 (2004) (court erred in attempting to factor a defendant's youthful inexperience with law enforcement into the determination of custody for Miranda purposes – a subjective test of voluntariness has no place in the objective test of custody).

Interrogation is not custodial simply because it takes place in a confined or restrictive environment. See Mathiason, 429 U.S. at 495 (detective invited suspect to the station house where he was presented with a misleading version of the evidence but was told truthfully that he would not be arrested if he confessed); Beheler, 463 U.S. at 1125 (defendant voluntarily accompanied police to the station where he was told truthfully that he was not under arrest). The more familiar or neutral the setting of the interview, the less likely it will be deemed to have a coercive overtone, as is usually the case when

---

statement of the law. "[A]ny inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of Miranda." Stansbury v. California, 511 U.S. 318, 326 (1994).

9

questioning takes place in a suspect's own home.  See Beckwith v. United States, 425 U.S. 341, 347 (1976).  The tone of the interrogation may also figure in the determination of whether the setting was custodial.  See id. at 343 (conversation was "friendly," "relaxed," and "[un]press[ing]"); United States v. Leyva, 659 F.2d 118, 120 (9th Cir. 1981) (questioning was "low-key").  Compare Orozco v. Texas, 394 U.S. 324, 325 (1969) (defendant was questioned while surrounded in his bed by four armed officers).

Here, by any objective test, the custodial element triggering Miranda is absent.  The questioning of Patricia Foley, if at times firm, was polite and conversational.  The questioning took place in a familiar and comfortable setting – the dining room of Patricia Foley's home.  Only two agents – Prough and Mackey conducted the interview – two of the four other officers remained in the kitchen while the other two stayed outside the house.  Foley was permitted to come and go without hindrance.  She freely answered her telephone, went to the front door to speak with a business friend, and spoke privately with her son on his arrival home.  Perhaps of greatest significance, she was never told that she was under arrest or would be arrested.  Nor in fact was she arrested.  That the interview lasted two hours is of some significance, but the duration of the questioning had more to do with extraneous interruptions and Patricia Foley's unsuccessful attempt to cooperate than it did with any implied or overt coercion on the agents' part.[14]

2. Trickery

---

[14]That Foley was remorseful over having entangled her husband in her drug dealing does not enter into the custodial calculus.  "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  Stansbury, 511 U.S. at 323.

As a second ground to suppress her statements, Foley states in her supporting affidavit: "I was also told that if I cooperated no charges would be brought against me."[15] A confession extracted by a promise of leniency is suspect.[16]  See Griffin v. Strong, 983 F.2d 1540, 1543-44 (10th Cir. 1993).  On the other hand, a promise to bring cooperation to the attention of the prosecutor or the court, without more, is not coercive as a matter of law.  See United States v. Fera, 616 F.2d 590, 594 (1st Cir. 1980); United States v. Pelton, 835 F.2d 1067, 1072-73 (4th Cir. 1987).  As the agents offered to do no more than report her efforts to cooperate (which they did), there is no basis for a finding that she was illegally "tricked" into confessing.[17]

## ORDER

For the foregoing reasons, the motions of John Foley and Patricia Foley to suppress statements and physical evidence are DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[15]Foley did not repeat this assertion in her testimony at the hearing.

[16]It is not, however, conclusive.  Even an improper offer of leniency, as for example a promise that no charges will be brought if a defendant confesses, will not render a confession involuntary unless the offer overcomes a defendant's free will.  United States v. LeBrun, 363 F.3d 715, 725-26 (8th Cir. 2004) (en banc).

[17]Patricia Foley also challenges the validity of her consent to search her home.  Cf. Georgia v. Randolph, 547 U.S. 103, 120 (2006).  Because the argument for suppression of the physical evidence is premised on the presumed illegality of her confession, see Foley Memorandum, at 19, it does not survive the court's finding that the circumstances of the confession offend no constitutional norm.